UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
                             :

PEOPLE OF THE STATE OF NEW YORK, by   :   **COMPLAINT**
LETITIA JAMES, Attorney General         :
of the State of New York,                  :
                             :   Civil Action No. 21-cv-4533
                  Plaintiff,   :

           — against —           :

UNITED HEALTH GROUP              :
INCORPORATED, UNITED BEHAVIORAL   :
HEALTH (d/b/a OPTUMHEALTH       :
BEHAVIORAL SOLUTIONS), UNITED     :
HEALTHCARE INSURANCE COMPANY,   :
OXFORD HEALTH INSURANCE, INC.,    :
OXFORD HEALTH PLANS, LLC, OXFORD  :
HEALTH PLANS (NY), INC., UNITED     :
HEALTHCARE INSURANCE COMPANY OF  :
NEW YORK, and UNITEDHEALTHCARE OF  :
NEW YORK, INC.,                :
                             :
                Defendants.   :
                             :
------------------------------------------------------------ X

Plaintiff, the People of the State of New York, by its attorney, LETITIA JAMES, Attorney

General of the State of New York, alleges upon information and belief the following against

UnitedHealth Group, Incorporated ("UHG"), United Behavioral Health ("UBH"), United

Healthcare Insurance Company ("UHIC"), Oxford Health Insurance, Inc. ("OHI"), Oxford Health

Plans, LLC ("OHP"), Oxford Health Plans (NY), Inc. ("OHP-NY"), UnitedHealthcare Insurance

Company of New York ("UHIC-NY"), and UnitedHealthcare of New York, Inc. ("UHC-NY")

(collectively, "Defendants"):

## PRELIMINARY STATEMENT

1.      For years, the nation's largest health insurance company has – including during the coronavirus ("COVID-19") pandemic – systematically and illegally limited consumers' access to potentially life-saving mental health and substance use disorder treatment. As the opioid epidemic, the suicide epidemic, and the COVID-19 pandemic took a heavy human toll, United improperly denied or reduced thousands of claims for these critical health services. This lawsuit seeks an end to Defendants' discriminatory practices and restitution for those who have suffered under them.

2.      Mental and emotional well-being is essential to overall health. Each year, one in five New Yorkers has symptoms of a mental disorder, and one in ten adults and children in New York experience mental health challenges serious enough to affect functioning in work, family and school life. Mental illness is a major cause of death (via suicide), and a driver of school failure, unstable employment, poor overall health, incarceration and homelessness. The National Institute of Mental Health reports that mental health and substance use (together, "behavioral health") disorders are among the leading causes of disability in the United States.

3.      In recent years, the opioid epidemic has taken an increasingly deadly toll. According to the Centers for Disease Control and Prevention ("CDC"), more than 3,600 New Yorkers died from opioid overdoses in the twelve-month period ending in July 2020, a 22% increase from 2018.

4.      The COVID-19 pandemic has further exacerbated the mental health and addiction crises facing this country. In June 2020, a CDC survey found that 40% of American adults reported at least one adverse behavioral health condition, including experiencing symptoms of mental

illness or substance abuse, related to the pandemic.[1] The CDC reported that, like COVID-19, these conditions were disproportionately affecting certain populations, including racial and ethnic minorities. According to a Gallup survey released in December 2020, Americans' assessment of their mental health is "worse than it has been at any point in the last two decades."[2]

5.      The mental health of young people has been particularly harmed by COVID-19. A study published in *Pediatrics* in March 2021 reported a significantly higher rate of suicide ideation among youth in March and July 2020 and higher rates of suicide attempts in February, March, April, and July 2020, as compared with the same months in 2019.[3]

6.      Outpatient psychotherapy and counseling are an integral part of behavioral health treatment for many individuals, and play a critical role in addressing these pervasive public health issues. According to the Substance Abuse and Mental Health Services Administration ("SAMHSA"), outpatient therapy and counseling is an evidence-based treatment for mental and substance use disorders.[4] Rigorous clinical research studies have shown that a variety of psychotherapies are effective with children and adults, across diverse conditions.[5] Numerous large-scale trials and quantitative evidence reviews support the efficacy of cognitive-behavioral therapy

---

[1] Centers for Disease Control, *Mental Health, Substance Use, and Suicidal Ideation During the COVID-19 Pandemic — United States*, Morbidity and Mortality Weekly Report June 24–30, 2020, 69(32); 1049–1057, available at https://www.cdc.gov/mmwr/volumes/69/wr/mm6932a1.htm.
[2] Brenan, M., *Americans' Mental Health Ratings Sink to New Low*, December 7, 2020, available at https://news.gallup.com/poll/327311/americans-mental-health-ratings-sink-new-low.aspx.
[3] *R. Hill, et al., Suicide Ideation and Attempts in a Pediatric Emergency Department Before and During COVID-19, Pediatrics, March 2021, 147 (3), available at https://pediatrics.aappublications.org/content/pediatrics/147/3/e2020029280.full.pdf.*
[4] Substance Abuse and Mental Health Services Administration, *Behavioral Health Treatments and Services*, available at http://www.samhsa.gov/treatment.
[5] American Psychological Association, *Recognition of Psychotherapy Effectiveness* (2012), available at http://www.apa.org/about/policy/resolution-psychotherapy.aspx.

for alcohol and drug use disorders.[6]

7.      The majority of individuals who use outpatient mental health services receive psychotherapy and/or mental health counseling.[7] Psychotherapy and counseling services are most commonly delivered by psychologists and master's level clinicians, who comprise the majority of the behavioral health workforce.[8]

8.      Because behavioral health treatment can be costly, many Americans depend on health insurance coverage to access services. For decades, health insurance companies provided little or no coverage for behavioral health treatment. Lack of access to behavioral health treatment, which can be caused by health plans' denials of coverage and other failures to properly administer benefits, can have serious consequences for consumers, resulting in interrupted treatment, more serious illness, and even death.

9.      To overcome this legacy of discrimination, many jurisdictions enacted mental health and substance use disorder parity laws, in order to increase health insurance coverage and to reduce the stigma preventing many people from seeking treatment for mental illness and addiction.

10.     In 2006, New York led the country by enacting a landmark behavioral health parity law known as "Timothy's Law," which, as originally codified in the New York Insurance Law, required health plans to cover inpatient and outpatient mental health treatment in a manner at least

---

[6] McHugh, R.K., *Cognitive-Behavioral Therapy for Substance Use Disorders*, 33 Psychiatr Clin North Am. 511 (2010), available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2897895/.

[7] Germack et al., *National Trends in Outpatient Mental Health Service Use Among Adults Between 2008 and 2015*, 71 Psychiatric Services 1127, 1132 (2020), available at https://pubmed.ncbi.nlm.nih.gov/32907475/.

[8] Substance Abuse and Mental Health Services Administration, *Behavioral Health Workforce Report* (2020), at 27, available at https://www.samhsa.gov/sites/default/files/saving-lives-mental-behavioral-health-needs.pdf.

equal to those plans' coverage for physical health ailments. *See* 2006 N.Y. Sess. Laws Ch. 748.

11.     In 2008, Congress passed the Mental Health Parity and Addiction Equity Act ("MHPAEA"), which prohibits covered group health plans from imposing treatment limitations on mental health and substance use disorder benefits ("mental health benefits") that are more restrictive than the treatment limitations they apply to medical/surgical benefits. 42 U.S.C. § 300gg-26; 45 C.F.R. § 146.136(c). The essential health benefit regulations under the Affordable Care Act extend MHPAEA's requirements to small and individual health plans. 45 C.F.R. § 156.115(a)(3). New York has modified its behavioral health parity laws to mirror, and to exceed, the requirements of MHPAEA. *See, e.g.,* 2019 Sess. Laws Ch. 57.

12.     Defendants administer health benefits for hundreds of thousands of New Yorkers, including many who struggle with mental health and addiction challenges. As a result of Defendants' violations, many members did not receive the behavioral health benefits to which they were entitled under their United Plans.

13.     Defendants have violated their obligations under federal and New York parity laws and have improperly discriminated against members in two significant ways. These violations impair plan members' ability to access outpatient psychotherapy and counseling services. Thus, individuals who may be in the throes of a mental health or addiction crisis may not be able to access treatment that could prevent their symptoms from worsening.

14.     The first violation is that Defendants engage in stricter utilization review for outpatient behavioral health treatment as compared to outpatient medical/surgical health treatment. Defendants' outlier management program, known as Algorithms for Effective Reporting and Treatment ("ALERT"), limits benefits for outpatient behavioral health benefits in a way that is broader and more aggressive than the programs that Defendants have in place for analogous

medical/surgical benefits. For example, under the ALERT Program, after a member exceeds 20 psychotherapy or counseling treatment sessions within a six-month period, the member and her provider must justify to Defendants why further treatment is medically necessary and thus eligible for reimbursement.

15.     The second violation is that Defendants impose arbitrary penalties on members' reimbursement on outpatient, out-of-network psychotherapy and counseling rendered by doctoral-level psychologists and master's level counselors, who provide the vast majority of these services. Specifically, through this Discriminatory Reimbursement Penalty, Defendants artificially reduce the "Allowed Amount" – the maximum amount of the provider's bill deemed eligible for reimbursement – for services provided by psychologists and master's level counselors, by 25% to 35%.

16.     Defendants do not apply a comparable Reimbursement Penalty on members' reimbursement of out-of-network medical/surgical treatment. As a result, Defendants systematically reimburse members for out-of-network behavioral health services in a more restrictive manner than they reimburse for out-of-network medical/surgical services, in violation of the parity laws.

17.     As a result of Defendants' discriminatory policies, members of United Plans with behavioral health conditions may not be able to access outpatient psychotherapy and counseling at all. Even if they can access such treatment, often they must pay more for out-of-network behavioral health care than if they had gone to see a physician for a basic physical health ailment.

18.     For example, pursuant to ALERT, United has denied coverage for tens of thousands of psychotherapy sessions (including for New York fully insured members) since 2013, even *during the COVID-19 pandemic*, and in December 2020, United's ALERT staff imposed

modifications (typically reductions in the duration or frequently of treatment) in 69% of the cases they handled, referring 13% of cases for peer review and extra scrutiny.

19.     Based on the foregoing and as set forth more fully below, pursuant to the New York Insurance Law, MHPAEA, New York General Business Law § 349, and New York Executive Law § 63(12), the People of the State of New York, by Letitia James, Attorney General of the State of New York ("Plaintiff" or "the Attorney General") brings this action against Defendants for violations of behavioral health parity laws and other laws protecting the rights of consumers. Plaintiff seeks injunctive relief, restitution, penalties and costs against Defendants.

## JURISDICTION AND VENUE

20.     This action arises under the laws of the United States, including 42 U.S.C. § 300gg, *et seq*.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. This Court may exercise supplemental jurisdiction over the claims based on New York law pursuant to 28 U.S.C. § 1367.

21.     This Court has jurisdiction to issue the declaratory relief requested pursuant to the Declaratory Relief Act, 28 U.S.C. §§ 2201, 2202. This Court may also grant injunctive relief pursuant to Federal Rule of Civil Procedure 65.

22.     Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(1) and (2), because some of the Defendants reside in, and during the relevant period, sold and/or administered health plans in this District, and a substantial portion of the events described herein occurred in this District.

## PARTIES

23.     Plaintiff, the People of the State of New York, is represented by its chief legal officer, Letitia James, Attorney General of the State of New York, who brings this action pursuant

to the authority granted to her under the federal Public Health Services Act ("PHSA"), which authorizes States to enforce the provisions of MHPAEA. 42 U.S.C. § 300gg-22(a)(1).

24.     The Attorney General further brings this action pursuant to the authority granted to her under New York Executive Law § 63(12), which authorizes her to seek injunctive relief, restitution, and damages against any person that engages in repeated fraud or illegality in the conduct of business, as well as New York General Business Law §§ 349(b) and 350-d, which empower the Attorney General to seek injunctive relief, restitution, and civil penalties against any person who engages in deceptive acts and practices in the conduct of business.

25.     Where, as here, the interests and well-being of the People of the State of New York as a whole are implicated, the Attorney General possesses *parens patriae* authority to commence legal actions in federal court for violations of federal and state laws and regulations. The Attorney General brings this action pursuant to this authority because the Defendants' actions alleged herein affect the state's quintessential quasi-sovereign interest in the health of its residents. The Defendants' actions, dating back years, have prevented a substantial segment of New York's population from accessing behavioral health care, including treatment for substance abuse and addiction, to which those residents are entitled by law. The Defendants' actions have thereby diminished the health of New Yorkers.

26.     Defendant UnitedHealth Group, Incorporated ("UHG") is a publicly held corporation headquartered in Minnetonka, Minnesota, and is the ultimate corporate parent of UBH. UHG operates health insurance companies throughout the country through various direct and indirect subsidiaries, including Defendants UHIC, OHP, OHP-NY and OHI. For all United Plans, Defendant UHG and its subsidiaries control the policies and procedures applicable to the processing of benefit claims and, in that capacity, developed and applied the ALERT Program and

the Discriminatory Reimbursement Penalty challenged herein. UHG, the nation's largest health insurer, had net earnings in 2020 of $15.8 billion, a 10% increase over the prior year.[9]

27.     Defendant United Behavioral Health ("UBH"), which operates under the brand name OptumHealth Behavioral Solutions, is a corporation organized and existing under the laws of California, with principal executive offices in San Francisco, California. UBH provides mental health services to health plans, in particular members of UnitedHealthcare ("UHC") plans offered by subsidiaries of UHG (collectively "United Plans"), including managing access to providers of mental health services and products for the members of these plans and designing benefits packages for them.

28.     Defendant United Healthcare Insurance Company ("UHIC"), an indirect subsidiary of UHG, is headquartered in Hartford, Connecticut and provides services to United Plans, including claims processing and adjudication.

29.     Defendant Oxford Health Insurance, Inc. ("OHI"), a wholly owned subsidiary of Defendant UHIC, is headquartered in New York, New York, and issues fully insured health plans in New York State.

30.     Defendant Oxford Health Plans, LLC ("OHP"), an indirect subsidiary of UHG, is headquartered in Shelton, Connecticut and provides services to United Plans, including developing and overseeing administrative policies and claims processing and adjudication.

---

[9] UnitedHealth Group Reports Fourth Quarter and Full Year 2020 Financial Results (Jan. 20, 2021), available at https://www.unitedhealthgroup.com/viewer.html?file=/content/dam/UHG/PDF/investors/2020/UNH-Q4-2020-Release.pdf.

31.     Defendant Oxford Health Plans (NY), Inc. ("OHP-NY"), a subsidiary of Oxford Health Plans, LLC, is headquartered in Shelton, Connecticut and provides claims administration services to United Plans.

32.     Defendant UnitedHealthcare Insurance Company of New York ("UHIC-NY"), a wholly owned subsidiary of Defendant UHIC, is headquartered in New York, New York, and issues fully insured health plans in New York State.

33.     UnitedHealthcare of New York, Inc. ("UHC-NY"), an indirect subsidiary of UHG, is headquartered in Islandia, New York, and issues fully insured health plans in New York State.

## FACTUAL ALLEGATIONS

34.     At all relevant times, and at least from 2012 until to present, Defendants have designed and managed benefits for, administered, and issued United Plans, including fully insured plans for more than a million New Yorkers in total. These plans include behavioral health benefits.

### A.  Defendants' Discriminatory Behavioral Health ALERT Program

35.     Defendants acknowledge that psychotherapy is effective. Nevertheless, Defendants manage – and limit or deny – coverage for health care services through a utilization management technique called outlier management, which is purportedly used to isolate high-use members or high-cost episodes of care. For behavioral health services only, Defendants use a tool known as ALERT, which includes more than 50 algorithms to identify what Defendants consider unusual treatment patterns (*e.g.*, high numbers of visits) or risk in behavioral health care. For medical/surgical benefits, Defendants do not use ALERT, and there is no comparable treatment limitation.

36.     At least nine of Defendants' behavioral health ALERT algorithms have led to denials of coverage and payment for outpatient services. At least four of these algorithms identify

10

outliers based solely on frequency of visits. For example, Defendants' "high utilization" ALERT algorithm is triggered after a member exceeds 20 psychotherapy visits within a six-month period. One of Defendants' senior executives responsible for implementing ALERT testified that there is no clinical basis for such ALERT triggers, which were set in 2007, a year before MHPAEA was enacted.

### 1.  How Defendants' Discriminatory ALERT Program Works

37.  When a case triggers one of Defendants' behavioral health ALERT algorithms (for example, 20 psychotherapy visits within a six-month period), a care advocate employed by Defendants reaches out to the member's provider to discuss the case and treatment plan. Defendants train their care advocates to apply Defendants' company-devised criteria for determining the medical necessity of treatment and to use scripts that require providers to justify further psychotherapy or counseling.

38.  If the care advocate determines that the frequency and duration of care do not meet Defendants' criteria and the provider does not agree to limit the frequency or duration of the member's treatment, the care advocate refers the case to a peer Reviewer.

39.  The peer reviewer and the member's provider discuss the case, and the provider is asked to share additional information. The peer reviewer then makes a coverage decision approving or denying further coverage, in which case United stops paying claims. Peer review under ALERT is cursory, with reviewers spending a mere eight to twelve minutes in each conversation with providers. During these brief conversations, Defendants' peer reviewers require providers to show a "clear and compelling" reason for the member to stay in treatment, and that the member is making progress in treatment.

40.     In contrast to Defendants' broad use of ALERT for outlier management of behavioral health benefits, Defendants use outlier management – but not ALERT – for only a handful of medical/surgical services, limited to some subset of physical therapy visits, occupational therapy visits, and chiropractic therapy visits.

41.     Defendants do not apply outlier management to many other medical/surgical services such as speech therapy and home health care. In fact, Defendants do not conduct *any* outlier management for physical health services provided by medical doctors or others who bill "evaluation and management" codes.

42.     Defendants acknowledge that they do not apply a comparable method of utilization review to all outpatient medical/surgical services, and that they lack evidence that they selected psychotherapy for outlier management using the same methodology that they apply to medical/surgical services. United singles out ***all*** persons with behavioral health conditions who need psychotherapy for undue scrutiny under its ALERT outlier management program, when this treatment may involve multiple sessions over a period of time. In contrast, with very limited exceptions, United does not apply outlier management to outpatient treatment of persons with chronic medical/surgical conditions, even when such treatments may involve multiple sessions over a period of time.

43.     Defendants have never analyzed whether all outpatient medical/surgical services should be subject to outlier management in the same manner in which they apply outlier management to outpatient behavioral health treatment. Defendants have never examined whether outlier management is warranted for chronic physical health conditions such as diabetes, hypertension, and asthma.

44.     Defendants use ALERT not to improve the behavioral health of members, but to identify cases for termination of treatment. Defendants require care advocates handling ALERT cases to meet quotas, including a reduction of care in 20% of the cases they are assigned, in the form of either a modification of the provider's treatment (*i.e.*, less frequent treatment) or a referral for peer review. The care advocates frequently exceed the 20% quotas, as shown by "ALERT scorecards," through which Defendants track compliance with imposed quotas on a daily and monthly basis. care advocates' bonuses are based on performance, as measured by their productivity, including the number of cases they handle. For example, in May 2019, the vast majority of Defendants' care advocates met or exceeded their quota to refer 20% of ALERT cases for peer review for potential denials. In fact, they referred ***two of every five*** cases.

45.     Defendants fail to disclose to members and providers that they designed ALERT, as one of Defendants' internal documents is entitled, for the "Relentless Pursuit of Cost Savings." Outpatient care accounts for 60% of behavioral health spending of United Plans, and the adoption and use of behavioral health ALERT saves Defendants significant amounts of money. Defendants have calculated precisely how many dollars their rationing of members' behavioral health care saves them: at least $330 per member, per ALERT intervention.

46.     Defendants, in violation of New York's consumer protection laws, also fail to provide members of non-ERISA United Plans with details about ALERT in plan documents or explanations of benefits, including that the ALERT program is a form of utilization review and can lead to denials of coverage for psychotherapy.

47.     Defendants mislead members about the purpose of ALERT by not affirmatively disclosing that ALERT is a form of utilization review, and by not disclosing that the purpose of ALERT is to identify cases for modification and/or termination.

## 2.   The Impact of ALERT

48.     In New York from 2013 through 2019, Defendants issued thousands of adverse benefit determinations for outpatient psychotherapy services based on their application of the ALERT program, almost half of which were for members in fully insured plans. The human impact of these denials is stark: in New York from 2013 through 2020, Defendants denied claims for more than 34,000 psychotherapy sessions, with total billed charges of more than $8 million. Of these denied psychotherapy sessions, more than 13,000 were for members in fully insured plans, with total billed charges of more than $3.6 million. People who receive denials must choose between paying hundreds or even thousands of dollars for continued care, and abruptly ending necessary treatment.

49.     These denial numbers do not fully capture the damage done to New Yorkers by Defendants' ALERT system for rationing outpatient behavioral health coverage. As described above, Defendants' care advocates may suggest a lower frequency of treatment to outpatient mental health providers, and if a provider agrees to such "modifications," they are not counted as denials.

50.     Some ALERT denials have resulted in United Plan members in New York needing to be hospitalized, when further psychotherapy might have prevented such terrible outcomes. For example, after Defendants limited coverage for a member's psychotherapy pursuant to ALERT, Defendants' senior medical director wrote to other company executives: "It's one thing to closely manage high functioning patients in character building analytic therapy.  But this woman was very ill and, as predicted, is hospitalized at NYP at $2000/day." Defendants have never checked whether people for whom it denied coverage under ALERT became more ill.

51.     These numbers do not reflect all harms from ALERT. Members who receive an ALERT denial may continue treatment but not submit claims, paying out of pocket, to their own financial detriment. But many cannot afford to do so. According to SAMHSA, 60% of Americans who do not receive necessary behavioral health treatment cite cost and health insurance issues as the reason.[10]

52.     Through 2021, Defendants continued to employ ALERT protocols (including scripts and workflows), placing burdens on members seeking coverage for behavioral health treatment. Defendants sent letters to members and their providers stating that if they did not submit clinical information, coverage may be denied. Defendants continued to track ALERT interventions with the expectation that care advocates will meet thresholds, i.e., get providers to lessen frequency/duration of treatment in at least 20% of cases and referrals at least 20% of cases to peer review, which can lead to denials. In December 2020, as the nation suffered from the brunt of the opioid epidemic, Defendants' ALERT staff achieved modifications (typically reductions in the duration or frequency of treatment) *in 69% of the cases they handled*, referring 13% of cases for peer review.

53.     Shockingly, Defendants continued to deny claims for psychotherapy sessions *during* the COVID-19 pandemic, issuing more than 3,300 ALERT claim denials for dates of service in the first 6 months of 2020, with total billed charges of more than $600,000. More than 1,000 of these denials were for New Yorkers, with total billed charges of more than $250,000.

## B.  Defendants' Discriminatory Reimbursement Penalty

---

[10] Substance Abuse and Mental Health Services Administration (SAMHSA), *Receipt of Services for Behavioral health Problems: Results from the 2014 National Survey on Drug Use and Health*, September 2015, available at http://www.samhsa.gov/data/sites/default/files/NSDUH-DR-FRR3-2014/NSDUH-DR-FRR3-2014/NSDUH-DR-FRR3-2014.htm.

54.     Defendants also limit access to psychotherapy and counseling through their arbitrary reductions of members' reimbursements for out-of-network outpatient treatment.

55.     Defendants have networks of providers that have agreed to accept its set rates as full payment, and not to seek additional reimbursement from United Plan members. However, many consumers with health insurance, including United Plan members, must turn to out-of-network providers due to the inadequacy of these provider networks.[11] A peer-reviewed study published in JAMA Network Open in 2019 showed that higher cost-sharing among those with behavioral health conditions may be indicative of limited in-network availability for behavioral health care.[12]

56.     When members of United Plans visit out-of-network providers, they generally incur out-of-pocket costs and they may request reimbursements from United Plans, subject to terms and reimbursement rate limits established by Defendants.

### 1. How Defendants' Discriminatory Reimbursement Penalty Works

57.     To set reimbursement rate limits for medical/surgical and behavioral health out-of-network services, Defendants begin with a third-party benchmark rate set by Medicare or an independent vendor. One such vendor, FAIR Health, operates a publicly available database, https://www.fairhealth.org/, which includes rates based on the nation's largest repository of private claims data. The rates contained in FAIR Health's database are used by health plans, including

---

[11] S. Busch, *Incorrect Provider Directories Associated with Out-of-Network Mental Health Care and Outpatient Surprise Bills*, 39 Health Affairs 975 (2020), available at https://www.healthaffairs.org/doi/pdf/10.1377/hlthaff.2019.01501.

[12] W. Xu, *Cost-Sharing Disparities for Out-of-Network Care for Adults with Behavioral Health Conditions,* 2 JAMA Netw Open. 2019 (11) (2019), available at https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2753980.

United Plans, to determine the "usual, customary, and reasonable" ("UCR") rates for many health care services.

58.     FAIR Health is an independent company that was established in October 2009, after an investigation by the OAG revealed that UHG, through its Ingenix database, had routinely reduced UCR rates for non-participating providers. The FAIR Health database was created as part of a settlement between UHG and the OAG, and for a certain time period, UHG agreed to use FAIR Health to determine reimbursement for non-participating providers whenever its plans required benefits to be paid based on UCR or similar language.

59.     However, Defendants apply more stringent reductions to behavioral health reimbursement rates, as opposed to medical/surgical rates. Across the board, for behavioral health treatment, United reduces reimbursement rates for doctoral-level psychologists by 25% and for master's-level counselors by 35%, relative to physicians providing the same behavioral health services.

60.     If a member of a United Plan visits an out-of-network doctoral-level psychologist for a 45-minute psychotherapy session, Defendants might have started their calculations of the reimbursement rate for that service using the FAIR Health rate of $150. However, Defendants would then have reduced the rate by 25% ($37.50), to $112.50 (the "allowed amount"), because the provider was a psychologist and not a medical doctor.

61.     Thus, if the psychologist billed $150 for the session, and assuming the member was responsible for a 30% coinsurance payment, the member would have received $78.75 from the plan (70% of $112.50), and would have had to pay $71.25 out of pocket -- $26 more than they should have.

62.     Defendants apply their arbitrary reimbursement reductions for certain levels of licensure uniformly when behavioral health providers provide the same services under the same psychotherapy billing codes, and without evaluating whether such a blanket policy is appropriate in application or scope.

63.     In contrast, for medical/surgical providers, Defendants reduce reimbursement rates based on the provider's licensure in only limited circumstances, such as assistant surgeon services.

64.     Defendants use these reimbursement rates to process out-of-network claims for services billed to United Plans. Thus, if a member of a United Plan goes to an out-of-network non-physician provider for mental health treatment, the amount that they receive back is artificially reduced by Defendants. By contrast, when a member of a United Plan goes to a non-physician provider for medical/surgical treatment, the amount that they receive back is generally not reduced by Defendants in this way.

65.     Defendants artificially depress the reimbursement rates for non-physician providers of psychotherapy, despite knowing that for the most common non-physician psychotherapy billing codes, the vast majority of claims used to calculate reimbursement rates are for services performed by non-physicians. Thus, Defendants lack any market-based justification for reducing reimbursement rates for those providers.

66.     Defendants hid their artificial rate reimbursement reductions from members and providers, as United Plan documents described the reimbursement of providers as being at "70% of the [reasonable and customary] charge" or at "70% of the Covered Expense," while making no mention of reimbursement rate reductions. United uses FAIR Health rates to determine reasonable and customary charges, and the amount its plans pay, but then **_reduces_** those rates arbitrarily. As a result, United Plans reimburse members less.

18

67.     Further, Defendants' Explanations of Benefits – key documents that communicate how reimbursements are calculated and what members owe – lacked any reference to the artificial rate reductions, leaving members and providers at a complete loss to understand how or why they were being shortchanged by Defendants.

68.     Additionally, United fails to disclose to members its basis for reducing reimbursement for non-physician providers of psychotherapy.

## 2.   The Impact of the Discriminatory Reimbursement Penalty

69.     Defendants have calculated that the direct impact of the reimbursement penalty nationally, net of member cost sharing, is at least $14.6 million, of which New York fully insured plans account for $7.9 million – more than half. Defendants have estimated that the universe of members who incurred unnecessary or costly out-of-pocket expenses nationally includes approximately 115,000 unique individuals.

70.     Defendants have suggested that in 2019, they ceased applying the Discriminatory Reimbursement Penalty to psychologists and had reduced the reduction for masters'-level providers from 35% to 25%. In Defendants have stated that their practice has been not to apply the Discriminatory Reimbursement Penalty for fully insured plans in New York. It is unclear whether these changes were actually implemented. Moreover, Defendants have indicated their intent to continue the Discriminatory Reimbursement Penalty in New York State.

**FIRST CAUSE OF ACTION**
**(Violations of N.Y. Behavioral Health Parity Laws: ALERT Outlier Management)**

71.     Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Attorney General hereby incorporates the allegations of all prior paragraphs.

72.     At all times relevant to this Complaint, United Plans simultaneously offered both medical/surgical benefits and mental health benefits.

73.     The behavioral health parity provisions of the New York Insurance Law forbid health plans from applying financial requirements or treatment limitations to mental health benefits that are more restrictive than the predominant financial requirements and treatment limitations applied to substantially all medical/surgical benefits they cover. New York Insurance Law §§ 3216(i)(31) & (i)(35); 3221(l)(5) & (7); 4303(g) & (l). The behavioral health parity provisions of the New York Insurance Law track and incorporate provisions of MHPAEA, which applies to health plans that cover both medical/surgical and behavioral health treatments. 42 U.S.C. § 300gg-26; 45 C.F.R. § 146.136(c)(4)(i).

74.     Under the behavioral health parity provisions of the New York Insurance Law, "treatment limitations" include "limits on the frequency of treatment, number of visits, days of coverage, or other similar limits on the scope or duration of treatment and includes nonquantitative treatment limitations such as: medical management standards limiting or excluding benefits based on medical necessity," and "methods for determining usual, customary, and reasonable charges." New York Insurance Law §§ 3216(i)(31) & (i)(35); 3221(l)(5) & (7); 4303(g). MHPAEA employs a substantially similar definition of "treatment limitation." 42 U.S.C. § 300gg-26; 45 C.F.R. § 146.136(c)(4)(i).

75.     The New York Insurance Law also requires health plans to provide coverage, "at a minimum, consistent with [MHPAEA]." New York Insurance Law §§ 3216(i)(31) & (i)(35);

3221(l)(5) & (7); 4303(g). MHPAEA "requires parity between mental health or substance use disorder benefits and medical/surgical benefits with respect to … treatment limitations under group health plans." Final Rules under the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008, 78 F.R. 68240 (Nov. 13, 2013).

76.     The New York parity law requires that utilization review for mental health benefits must be applied "in a consistent fashion to all services covered by [health insurance] contracts." 2006 N.Y. Sess. Laws Ch. 748, § 1.

77.     As an outlier utilization management program applying medical management standards that can and do exclude and limit or exclude benefits based on medical necessity, ALERT is a nonquantitative treatment limitation.

78.     Defendants apply ALERT broadly across outpatient behavioral health services.

79.     Defendants apply outlier management only to certain limited outpatient medical/surgical services, specifically some combination of physical therapy visits, occupational therapy visits, and chiropractic therapy visits, which do not constitute substantially all outpatient medical/surgical benefits provided under United Plans.

80.     Defendants do not apply outlier management to many outpatient medical and surgical services, such as speech therapy and home health care.

81.     Accordingly, the scope of ALERT does not comply with the parity protections of the New York Insurance Law.

82.     Through the conduct described above, and by subjecting behavioral health coverage to discriminatory practices and limiting and denying coverage of psychotherapy for thousands of members, Defendants have:

a.   Violated the behavioral health parity protections contained in New York Insurance Law sections 3216(i)(31) & (i)(35); 3221(l)(5) & (7); and 4303(g) & (l); and

b.   Caused harm to United Plan members, for which they are entitled to restitution.

## SECOND CAUSE OF ACTION
### (Violations of MHPAEA: ALERT Outlier Management)

83.   Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Attorney General hereby incorporates the allegations of all prior paragraphs.

84.   The Public Health Service Act confers primary jurisdiction on states to enforce MHPAEA with respect to health insurance issuers. 42 U.S.C. § 300gg-22(a)(1).

85.   Through the conduct described above, and by subjecting behavioral health coverage to discriminatory practices and limiting and denying coverage of psychotherapy for thousands of members, Defendants have:

a.   Violated the behavioral health parity protections of MHPAEA contained in 42 U.S.C. § 300gg-26 and 45 C.F.R. § 146.136(c); and

b.   Caused harm to United Plan members, for which they are entitled to restitution.

## THIRD CAUSE OF ACTION
### (Violations of N.Y. Behavioral Health Parity Laws:
### Discriminatory Reimbursement Penalty)

86.   Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Attorney General hereby incorporates the allegations of all prior paragraphs.

87.   Under the behavioral health parity provisions of the New York Insurance Law, "financial requirements" include "deductible[s], copayments, coinsurance and out-of-pocket expenses." New York Insurance Law §§ 3216(i)(31) & (i)(35); 3221(l)(5) & (7); 4303(g) and (l).

88.     Because it is a practice that systematically reduces reimbursement rates and thus requires members to pay higher deductibles, copayments, coinsurance, and out-of-pocket expenses for behavioral health services, Defendants' Discriminatory Reimbursement Penalty is a financial requirement.

89.     Because it is a "method[] for determining usual, customary, and reasonable charges," Defendants' Discriminatory Reimbursement Penalty is a nonquantitative treatment limitation, or "NQTL." 42 U.S.C. § 300gg-26; 45 C.F.R. § 146.136(c)(4)(i). Under the behavioral health parity provisions of the New York Insurance Law, "treatment limitations" include "limits on the frequency of treatment, number of visits, days of coverage, or other similar limits on the scope or duration of treatment and includes nonquantitative treatment limitations such as: medical management standards limiting or excluding benefits based on medical necessity," and "methods for determining usual, customary, and reasonable charges." New York Insurance Law §§ 3216(i)(31) & (i)(35); 3221(l)(5) & (7); 4303(g).

90.     Defendants designed the Discriminatory Reimbursement Penalty to apply routinely and broadly to outpatient, out-of-network mental health treatments, but Defendants do not apply reductions comparably to outpatient, out-of-network medical/surgical benefits.

91.     Defendants apply reductions on the medical/surgical side only rarely, such as for non-physicians performing assistant surgeon services, which do not constitute substantially all medical/surgical benefits under United Plans.

92.     Accordingly, the scope of the Discriminatory Reimbursement Penalty created and implemented by Defendants does not comply with the parity protections of the New York Insurance Law or MHPAEA.

93.     Through the conduct described above, and by arbitrarily reducing reimbursement for out-of-network outpatient behavioral health services for thousands of members, Defendants have:

       a.   Violated the behavioral health parity protections contained in New York Insurance Law sections 3216(i)(31) & (i)(35); 3221(l)(5) & (7); and 4303(g);

       b.   Caused harm to United Plan members, for which they are entitled to restitution.

### FOURTH CAUSE OF ACTION
**(Violations of MHPAEA: Discriminatory Reimbursement Penalty)**

94.     Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Attorney General hereby incorporates the allegations of all prior paragraphs.

95.     The Public Health Service Act confers primary jurisdiction on states to enforce MHPAEA with respect to health insurance issuers. 42 U.S.C. § 300gg-22(a)(1).

96.     Through the conduct described above, and by arbitrarily reducing reimbursement for out-of-network outpatient behavioral health services for thousands of members, Defendants have:

       a.   Violated the behavioral health parity protections of MHPAEA contained in 42 U.S.C. § 300gg-26 and 45 C.F.R. § 146.136(c); and

       b.   Caused harm to United Plan members, for which they are entitled to restitution.

### FIFTH CAUSE OF ACTION
**(N.Y. General Business Law § 349: Deceptive Acts and Practices)**

97.     Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Attorney General hereby incorporates the allegations of all prior paragraphs.

98.     New York General Business Law § 349(a) prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in New York State.

99.     Defendants have engaged in deceptive acts or practices in the conduct of their business by, *inter alia*:

    a.   Not providing members of non-ERISA United Plans with details about ALERT in plan documents or explanations of benefits;

    b.   Not disclosing to members of non-ERISA United Plans and their providers that the ALERT program is a form of utilization review and can lead to denials of coverage for psychotherapy;

    c.   Not disclosing to members of non-ERISA United Plans and their providers that Defendants designed ALERT for the "Relentless Pursuit of Cost Savings."

    d.   Not providing members of non-ERISA United Plans with details about the reimbursement penalty in plan documents or explanations of benefits;

    e.   Failing to disclose to members and providers Defendants' basis for reducing reimbursement for non-physician providers of psychotherapy.

100.    Through the conduct described above, Defendants have:

    a.   Violated N.Y. General Business Law § 349(a); and

    b.   Caused harm to United Plan members, for which they are entitled to relief.

## SIXTH CAUSE OF ACTION
### (N.Y. Executive Law § 63(12): Repeated and Persistent Fraud)

101.    Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Attorney General hereby incorporates the allegations of all prior paragraphs.

102.    New York Executive Law § 63(12) authorizes the Attorney General to bring an action to enjoin, and obtain restitution and damages, for "repeated fraudulent acts or illegal acts" or "persistent fraud or illegality in the carrying on, conducting or transaction of business."

103.    Defendants have engaged in repeated fraudulent acts and persistent fraud in the conduct of their business in New York by, *inter alia*:

    a.    Not providing United Plan members with details about the reimbursement penalty in plan documents or explanations of benefits;

    b.    Not providing United Plan members with details about ALERT in plan documents or explanations of benefits;

    c.    Not disclosing to United Plan members and their providers that the ALERT program is a form of utilization review and can lead to denials of coverage for psychotherapy.

104.    Through the conduct described above, Defendants have:

    a.    Violated N.Y. Executive Law § 63(12); and

    b.    Caused harm to United Plan members, for which they are entitled to relief.

## SEVENTH CAUSE OF ACTION
### (N.Y. Executive Law § 63(12): Illegality)

105.    Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Attorney General hereby incorporates the allegations of all prior paragraphs.

106.    New York Executive Law § 63(12) authorizes the Attorney General to bring an action to enjoin, and obtain restitution and damages, for repeated "illegal acts" or persistent illegality "in the carrying on, conducting or transaction of business."

107.    Defendants have engaged in "illegal acts" or persistent illegality "in the carrying on, conducting or transaction of business" in New York by, *inter alia*:

a.  Violating the behavioral health parity provisions of the New York Insurance Law;

b.  Violating MHPAEA; and

c.  Violating N.Y. General Business Law § 349.

108.  Through the conduct described above, Defendants have:

a.  Violated N.Y. Executive Law § 63(12); and

b.  Caused harm to United Plan members, for which they are entitled to relief.

## PRAYER FOR RELIEF

**WHEREFORE,** the People of the State of New York respectfully request that a judgment and order be issued:

A.  Adjudging and decreeing that Defendants have violated New York Insurance Law sections 3126, 3221, and 4303; 42 U.S.C. §§ 300gg-26; New York Executive Law § 63(12); and New York General Business Law § 349;

B.  Permanently enjoining Defendants from violating New York Insurance Law §§ 3126, 3221, and 4303; 42 U.S.C. §§ 300gg-26; New York Executive Law § 63(12); and New York General Business Law § 349;

C.  Barring Defendants from applying to behavioral health benefits the ALERT program;

D.  Barring Defendants from reducing reimbursement for outpatient psychotherapy services rendered by out-of-network non-physician providers to lower rates based on licensure;

E.  Ordering Defendants to ensure the reformation of all United Plan provisions that violate the New York Insurance Law and/or MHPAEA;

F.      Ordering Defendants to establish an Independent Review Process that shall re-adjudicate the claims of all members of United Plans subjected to the reimbursement penalty on or after January 1, 2012, ordering Defendants to pay any approved (including increased) claims paid, and assessing Defendants costs for re-adjudication;

G.      Ordering Defendants to establish an Independent Review Process that shall re-adjudicate the claims of all members of United Plans subjected to ALERT on or after January 1, 2012, ordering Defendants to pay any approved (including increased) claims paid, and assessing Defendants costs for re-adjudication;

H.      Appointing an Independent Fiduciary to administer the Independent Review Process made available to members of United Plans, and requiring Defendants to provide all necessary claims and participant information to the Independent Fiduciary;

I.      Ordering Defendants to pay Plaintiff's costs, including additional costs in the amount of $2,000 pursuant to CPLR § 8303(a)(6);

J.      Imposing civil penalties against Defendants in the amount of $1,000 for each violation of the New York State Insurance Law, pursuant to New York Insurance Law § 109(c)(1);

K.      Imposing civil penalties against Defendants in the amount of $5,000 for each violation of New York General Business Law § 349, pursuant to New York General Business Law § 350-d;

L.      Granting pre-judgment interest and lost opportunity cost; and

M.      Granting such other relief as the Court may deem equitable, just, and proper.

Dated:     New York, NY
           August 11, 2021

Respectfully submitted,

**LETITIA JAMES**
**Attorney General of the State of New York**

By:     /s/ Michael D. Reisman
        MICHAEL D. REISMAN
        Assistant Attorney General
        Health Care Bureau
        28 Liberty Street
        New York, NY 10005
        (212) 416-6269